## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE MOLSON COORS BEVERAGE COMPANY SECURITIES LITIGATION | 1:19-cv-00455-DME-MEH |
| This Document Relates To: <br><br> ALL ACTIONS | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT (Doc. 77)

In February 2019, Molson Coors Beverage Company ("Molson" or the "Company") announced that it had made a tax-accounting error in connection with its 2016 acquisition of MillerCoors LLC. The error caused Molson to understate significantly its tax liabilities in its 2016 and 2017 financial statements. After the announcement, Molson's share prices fell by nine percent. This securities fraud class action followed.

Plaintiffs allege that various Molson officers and directors knowingly or recklessly misstated Molson's financial statements in order to inflate share prices. Plaintiffs assert violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5.

This matter is before the Court on Defendants' Motion To Dismiss Plaintiffs' First Amended Complaint (Doc. 77) for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and the heightened pleadings requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ("PSLRA").  For the reasons set forth below, the Court GRANTS Defendants' motion.

## I.    BACKGROUND

Molson is one of the world's largest brewers.  In 2008, Molson partnered with SABMiller plc to produce beer in the United States and Puerto Rico through a joint venture called MillerCoors LLC.  Molson and SABMiller each held a 50% voting interest in MillerCoors and a 42% and 58% economic interest, respectively.  For tax purposes, Molson and SABMiller elected to treat MillerCoors as a partnership.  As a result, the tax attributes of MillerCoors passed through to Molson and SABMiller.

In November 2015, Anheuser-Busch InBev SA/NV ("ABI") announced that it was acquiring SABMiller.  Concurrently, Molson entered into an agreement with ABI to purchase SABMiller's interest in MillerCoors for $12 billion.  In October 2016, Molson completed the acquisition and became MillerCoors' sole owner.

After the acquisition, MillerCoors became a wholly owned subsidiary of Molson.  As a result, Molson's and MillerCoors' financial results were fully consolidated beginning on October 11, 2016.  Molson regularly issued Form 10-Q and Form 10-K filings, held quarterly earnings calls, and published its financial

results on BUSINESS WIRE.  For tax purposes, Molson continued to run

MillerCoors as a partnership until 2018.

On February 12, 2019, Molson filed a Form 8-K, stating that after discussion

between Company management and the Company's independent public accounting

firm, PricewaterhouseCoopers ("PwC"), Molson's Audit Committee had concluded

that the Company's consolidated financial statements for 2016 and 2017 should be

restated and should no longer be relied upon ("the Restatement").

In the Restatement, Molson acknowledged that its 2016, 2017, and three

quarterly 2018 consolidated financial statements were erroneous because it "did not

reconcile the outside basis deferred income tax liability for the investment in the

partnership to the book-tax differences in the underlying assets and liabilities within

the partnership."  (First Amended Complaint [FAC] ¶ 206.)  As a result, Molson's

2016 financial statements understated deferred tax liabilities and income tax expenses

by $399.1 million, and correlatively overstated net income by almost 20 percent.  In

its 2017 financial statements, the Company understated its net income and its income

tax benefit, yet the restatement of the 2016 financial statements resulted in a net

understatement of income tax expenses by $247.7 million for 2017.

In its Form 8-K, Molson also stated that it had determined that a material

weakness existed in its internal controls over financial reporting.  Specifically, the

Company failed to design appropriate controls "to identify and reconcile deferred

income taxes associated with the accounting for acquired partnership interests."  (Id.

¶ 202.)  After the Restatement, Molson's stock price dropped from $65.36 on February 11, 2019, to $59.19 per share on February 12, 2019—more than a 9% drop.

Lead Plaintiffs—Metropolitan Transportation Authority Defined Benefit Pension Plan Master Trust and Manhattan and Bronx Surface Transit Operating Authority Pension Plan—purchased Molson's Class B Common stock between February 14, 2017, when Molson first filed its consolidated financial statements reflecting the acquisition, and February 12, 2019, when Molson filed its corrected financial statements in a Form 10-K (the "Class Period").  Plaintiffs allege that they suffered damages as a result of Defendants' Exchange Act violations.

The primary defendants are Mark R. Hunter (Molson's President and Chief Executive Officer ("CEO") during the Class Period), Tracey I. Joubert (Molson's Chief Financial Officer ("CFO") during the Class Period), and Molson itself.  The Court refers to Hunter and Joubert together as the "Executive Defendants."  Plaintiffs also name thirteen defendants who served on Molson's Board of Directors during the Class Period.[1]

Plaintiffs allege that "[i]n order to inflate the price of Molson's Class B Common stock during the Class Period, Defendants caused the Company to report

---

[1] Plaintiffs additionally name ten "Doe" Defendants, including "various yet-to-be-identified individuals, officers, executives, corporations, agents and/or other business entities . . . that participated in the [alleged] violations."  (FAC ¶¶ 42–44.) Defendants ask the Court to dismiss the unspecified "Doe" Defendants.  Because the Court dismisses Plaintiffs' First Amended Complaint in its entirety and as to all defendants, that request is mooted and therefore the Court does not address whether Plaintiffs properly pleaded allegations against fictitious parties.

falsely its financial results by overstating retained earnings, net income, and tax benefits and understating deferred tax liabilities." (Id. ¶ 1.)  Plaintiffs claim injury as a result of Molson's "positive (but false)" financial statements, as Plaintiffs purchased Molson Class B Common stock "at artificially inflated levels and were damaged when the truth was revealed" and Molson's stock price declined.  (Id. ¶ 10.) Plaintiffs assert two claims: (1) violations of section 10(b) of the Exchange Act and Rule 10b–5 against Molson, Hunter, and Joubert; and (2) violations of section 20(a) of the Exchange Act against all individual defendants.  Defendants moved to dismiss, arguing that Plaintiffs failed adequately to plead scienter.

## II.    DISCUSSION

### A.    Section 10b and Rule 10b–5

#### i.    Legal Framework

Section 10(b) and Rule 10b–5 "prohibit making any material misstatement or omission in connection with the purchase or sale of any security."  Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014).  To establish a violation of § 10(b), a plaintiff must plausibly allege that the defendant made a statement that: (1) contained false or misleading statements of material fact, or failed to state a material fact necessary to make the statement not misleading; (2) related to the purchase or sale of securities; (3) was made with scienter, that is, with intent to defraud or recklessness; (4) led to reliance by the plaintiff; and (5) caused the plaintiff's loss.  Nakkhumpun v. Taylor, 782 F.3d 1142, 1146–47 (10th Cir. 2015). Here, Defendants argue only that Plaintiffs have failed adequately to plead scienter.

"A plaintiff may establish scienter either with facts evidencing the defendant's intent to deceive or defraud, or with facts establishing the defendant acted recklessly."  In re Zagg, Inc. Sec. Litig., 797 F.3d 1194, 1201 (10th Cir. 2015). Recklessness is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  In re Gold Res. Corp. Sec. Litig., 776 F.3d 1103, 1113 (10th Cir. 2015).  "Negligence, even gross negligence, is not sufficient; something similar to 'conscious disregard' is required."  Id.  A corporation's scienter is imputed based on the scienter of "the individual corporate official or officials who make or issue the [false] statement."  Smallen v. W. Union Co., 950 F.3d 1297, 1312–13 (10th Cir. 2020).

A § 10(b) plaintiff "bears a heavy burden at the pleading stage."  In re Level 3 Commc'ns Sec. Litig., 667 F.3d 1331, 1333 (10th Cir. 2012).  Under the PSLRA, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  In re Gold Res. Corp., 776 F.3d at 1109 (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

In considering Defendants' motion to dismiss, this Court must accept all factual allegations in the complaint as true, but need not accept the complaint's legal conclusions.  In re Zagg, 797 F.3d at 1201.  The Court will "consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference,

and matters of which a court may take judicial notice."[2]  Tellabs, Inc. v. Makor

Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).  The Court assesses the complaint

holistically and considers "whether all of the facts alleged, taken collectively, give

rise to a strong inference of scienter, not whether any individual allegation,

scrutinized in isolation, meets that standard."  Id. at 323.

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of

scienter, the [C]ourt must take into account plausible opposing inferences."  Id.

Plaintiffs may avoid dismissal "only if a reasonable person would deem the inference

of scienter cogent and at least as compelling as any opposing inference one could

draw from the facts alleged."  Id. at 324.

**ii.     Analysis**

Plaintiffs organize their scienter allegations collectively rather than isolating

allegations by defendant.  Neither the Supreme Court nor the Tenth Circuit has

decided whether such group pleading is sufficient under the heightened pleading

standard of the PSLRA.  TDC Lending LLC v. Private Capital Grp., Inc., 340 F.

Supp. 3d 1218, 1226 (D. Utah 2018).  Some district courts in the Tenth Circuit have

concluded that group pleading is no longer sufficient to allege scienter for securities

fraud.  Id. at 1226–27.

---

[2] The Court will consider such documents only for what they contain, not to
prove the truth of their contents.  Emps.' Ret. Sys. of R.I. v. Williams Co., 889 F.3d
1153, 1158 (10th Cir. 2018).

If that is correct and the group pleading doctrine is no longer viable, Plaintiffs must establish scienter individually for each Executive Defendant as well as Molson itself. This Court declines to address whether the group pleading doctrine remains viable, however, as it finds that Plaintiffs' allegations fail to give rise to a strong inference of scienter even if considered collectively.

### 1.    Allegations of Scienter

The Court begins by addressing each allegation of scienter or its absence, reviewing the merits of each. The Court then considers the collective allegations holistically.

### a.    The Restatement Error and the PwC Audits

Molson's 2018 Form 10-K admitted that Molson had misstated its deferred tax liabilities by nearly $400 million, resulting in erroneous financial statements. From this, Plaintiffs allege scienter. But the mere existence of an error warranting restatement does not necessarily reflect on the scienter behind that error. In re Sun Healthcare Grp., Inc. Sec. Litig., 181 F. Supp. 2d 1283, 1297 (D.N.M. 2002). "To hold otherwise would subject every financial restatement to liability." Id.

Whether the Restatement and the underlying tax-accounting error imply scienter depends on what exactly the error entailed. Here, as described in the 2018 Form 10-K, the error was Molson's failure to "reconcile[] its outside basis for its investment in the partnership to the book-tax differences in the underlying assets and liabilities within the partnership." (FAC ¶ 279.)

The parties disagree on the complexity of that error.  Plaintiffs frame it as "the simple step of failing to reconcile the book-tax assets."  (Opp'n Br. 19.)  Plaintiffs label this as an "'Accounting 101' text book type of reconciliation" involving "relatively straightforward or basic" generally accepted accounting principles ("GAAP").  (Id. at 12.)  Because Defendants did not take "the simple accounting 101 step to reconcile at the book-tax differences," Plaintiffs conclude the error was intentional or deliberately reckless.  (Id. at 5.)

If the error really was that simple, the Court agrees that it might be indicative of scienter.  See Costas v. Ormat Techs., Inc., 2019 WL 6700199, at *6 (D. Nev. Dec. 6, 2019) (finding that a violation of "bright-line [GAAP] rules" is indicative of scienter).  A violation of a simple accounting rule could be indicative of scienter, and the simpler the rule the stronger the implication.

To determine the complexity of the error, the Court looks to Molson's Form 10-K for its description of the error:

> Upon the dissolution of the MillerCoors partnership, we changed our outside basis deferred tax liability for our investment in the partnership to separate deferred tax positions for each of the individual book-tax basis differences in the underlying assets and liabilities of MillerCoors. In doing so, we identified a difference between the deferred tax liabilities recorded [outside] and the deferred tax liabilities required [inside] related to our acquired partnership interest in MillerCoors. Specifically, upon closing of the Acquisition and completion of the related deferred income tax calculations associated with the remeasurement of the previously held equity interest in MillerCoors, we did not reconcile the outside basis deferred income tax liability for the investment in the partnership to the book-tax differences in the underlying assets and

9

> liabilities within the partnership, which would have
> identified the difference resulting from the Acquisition.

(MTD Reply 9.)  The Court agrees with Defendants that this involves a technical tax-accounting error "relating to the 'look through' method applied to the accounting for income taxes of a partnership and related income tax complexities resulting from accounting for a step acquisition."  (Id.)

That the error was indeed complex, technical, and not obvious is confirmed by the fact that PwC conducted annual audits of Molson's financial reporting for both 2016 and 2017 and failed to identify the error.  Plaintiffs bring no claim against PwC and do not allege that Defendants concealed the fraud from PwC or that PwC was aware of the accounting error or participated in the alleged fraud.  That PwC failed to identify the error until the Restatement strongly suggests that it was not a simple and obvious error indicative of scienter.

The parties dispute how much weight should be given to Defendants' reliance on PwC's independent audits.  Defendants argue that unqualified opinions from independent auditors are highly probative of the absence of scienter and demonstrate that any accounting errors were not so obvious as to demonstrate scienter.  See Phillips v. Harvest Nat. Res., Inc., 2016 WL 4523849, at *3 (S.D. Tex. Aug. 25, 2016) ("That a major accounting firm approved the filings shows that the errors were not so obvious that their publication demonstrates an intent to defraud investors."); In re Hansen Nat. Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1158 (C.D. Cal. Oct. 16, 2007) (finding an independent auditor's unqualified opinion highly probative of an

absence of scienter). Plaintiffs' only rebuttal is that scienter could still be found even where financial statements are independently audited. But every case they cite involves circumstances where the defendants withheld documents from the auditor, the auditor allegedly was involved in the fraud, or independent allegations raised a strong inference of scienter. None of that applies here.

Defendants cannot hide behind an auditor. That means they are ultimately responsible for the accounting error, but it does not by itself mean that the accounting error was fraud. Accordingly, the Court finds that the PwC audits do not categorically insulate Defendants from liability, but they do weigh against an inference of scienter.

In sum, absent particularized factual allegations that Defendants knew that they needed to reconcile the outside basis of the acquired partnership interest with the book-tax differences of the partnership's underlying assets, the existence of the accounting error does not itself prove scienter. At most, Plaintiffs allege negligence, but not "something similar to conscious disregard." In re Gold Res. Corp., 776 F.3d at 1113. The Court finds that the Restatement error itself does not lend to a strong inference of scienter and that PwC's involvement weighs against an inference of scienter.

### b.    Magnitude of the Restatement

Plaintiffs next argue that the Restatement's substantial magnitude supports scienter, as Defendants understated Molson's deferred tax liabilities by almost $400

million.[3]  The magnitude of an alleged falsity can strengthen a scienter inference.
Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1106 (10th Cir. 2003).  However,
scienter allegations can also be lacking despite issues of significant financial
magnitude.  See, e.g., Anderson v. Spirit Aerosystems Holdings, Inc., 827 F.3d 1229,
1251 (10th Cir. 2016).

The Court first addresses Defendants' argument that the error was not of
substantial magnitude.  That argument takes two tacks.  First, Defendants argue that
the $400 million error was not substantial because it constituted only 2 percent of the
$12 billion acquisition and less than 1 percent of Molson's $30 billion in assets.  The
Court finds this argument insufficient: it does not address the error's impact on
Molson's income, and even a fraud constituting a small percentage of a defendant's
assets can be actionable.  Second, Defendants assert that the error was actually $247
million, not $400 million.  In reality the error was both—a $400 million error in 2016
deferred tax liabilities, restated to $247 million in 2017 as a result of the new tax
laws.  The Court finds little difference between a $247 million error and a $400
million error and considers either one substantial.  But the substantial error still
might cut both ways.

On one hand, it is reasonable to infer that such a substantial financial matter,
resulting in the understatement of deferred tax liabilities by 23 percent, would be

_____

[3] Plaintiffs also describe the error as both an overstatement of net income and
an understatement of income tax expense.  But those are merely different ways of
measuring the same error and thus do not increase its magnitude.

known by Molson and the Executive Defendants.  See Kinder-Morgan, 340 F.3d at 1106 (finding an inference of scienter where the alleged fraud increased the company's reported net income by more than 25 percent).  An error of that size on the facts before the Court do not alone raise a strong inference of scienter (it could simply be an error), but it could suggest scienter if supported by other particularized facts.

On the other hand, the magnitude of the Restatement could favor Defendants in that it implies complexity in the application of technical tax-accounting principles to substantial assets and liabilities.  It could also reflect nothing other than that a single accounting error on an acquisition of significant financial magnitude can result in a mistake of significant financial magnitude.  Even a two-percent error is significant when $12 billion is in play.

Overall, the Restatement's sheer magnitude could support some inference of scienter, based on the rationale that hundreds of millions of dollars were at stake and that Defendants would be aware of such a significant financial issue.  Alone, however, it is not sufficient to raise a strong inference of scienter.

### c.    Inadequate Internal Controls

Molson's 2018 Form 10-K attributed the Restatement error to a material weakness in Molson's internal control over financial reporting.  Plaintiffs argue that the existence of a material weakness indicates scienter.  The Court rejects this argument, finding instead that the lack of adequate controls arguably cuts against an inference of scienter.

Plaintiffs first focus on various statements Defendants made throughout the Class Period affirming the efficacy of their internal controls over financial reporting. Plaintiffs repeatedly emphasize that these statements were false when made because Molson later admitted its controls were inadequate. Yet the fact that the statements later turned out to be false says nothing about whether Defendants made them with scienter.

Plaintiffs make several additional arguments they believe support scienter: (1) that Defendants personally participated in creating the internal controls, (2) that there was a two-year delay in identifying the error, and (3) that Defendants subsequently remediated the material weakness. But all of that is consistent with the eventual discovery and remediation of a hidden error and does little to suggest that Defendants knew about the material weakness during the Class Period or were deliberately reckless about it. Like the accounting error, the mere existence of a material weakness in internal controls does not establish Defendants' scienter regarding that weakness.

Plaintiffs finally assert that "[a]t a minimum, Defendants were reckless in failing to create adequate, even nominal, internal controls for financial reporting." (Opp'n Br. 17.) But this legal conclusion is unsupported by factual allegations showing Defendants knew the internal controls were inadequate or recklessly disregarded their inadequacy.

To that point, the complaint section on "Inadequate and Ineffective Internal Control" alleges that (1) Defendants were responsible for maintaining adequate

14

controls, (2) material weaknesses do not exist in companies where executives are committed to reporting accurate financials, (3) the existence of the material weakness should have put the Defendants "on high alert" that their financial statements could be false, and (4) Defendants' financial statements should have been monitored "very closely." (FAC ¶ 312.) Plaintiffs conclude that "Defendants' failure to institute effective controls throughout the Class Period and to allow a material weakness to persist for eight consecutive quarters further strengthen the inference that Defendants knew, or were deliberately reckless in not knowing, of their misstatements and omissions." (Id.) To the extent that these conclusory allegations have any merit, at most they might suggest that Defendants were negligent or even grossly negligent in failing to ensure the existence of adequate controls, but none of them suggest that Defendants were actually aware of the material weakness before the disclosure in the Form 8-K on February 12, 2019. To the contrary, the material weakness in Molson's internal controls over financial reporting may well favor Defendants by explaining why the accounting problem was missed, without implying anything about Defendants' scienter.

### d.      Motive and Opportunity

Pleading motive and opportunity alone is not sufficient to plead scienter, but a motive to commit fraud can support an inference of scienter. City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1263 (10th Cir. 2001). Likewise, the absence of a motive allegation is not dispositive, but it is relevant and counts against scienter. In re Level 3, 667 F.3d at 1347. Where a motive is absent, other circumstantial

allegations of scienter must be "correspondingly greater." Id. (quoting Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1069 (5th Cir. 1994)). The Court finds no motive here.

Motive allegations must show that "the defendant benefitted from the alleged fraud in some concrete and personal way." In re Qwest Commc'ns Int'l, Inc. Sec. Litig., 396 F. Supp. 2d 1178, 1194 (D. Colo. 2004). "[P]ersonal financial gain may weigh heavily in favor of a scienter inference." Tellabs, 551 U.S. at 235. However, "general motives for management to further the interests of the corporation fail to raise an inference of scienter." In re Level 3, 667 F.3d at 1346.

Here, Plaintiffs' primary motive allegation is that certain defendants profited from stock sales at artificially inflated share prices during the Class Period. Insider stock trading could be indicative of scienter, but only if it is suspicious. Smallen, 950 F.3d at 1310. "To determine whether trading activity is suspicious, courts consider several factors, including 'the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling.'" Id. (quoting In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74–75 (2d Cir. 2001)).

Plaintiffs allege that Peter H. Coors ("PH Coors")—a § 20(a) defendant as a member of Molson's Board—sold 55,000 Molson shares on the open market for proceeds of about $4.7 million, while Hunter sold 2,070 shares for $126,800, and

Joubert sold 1,000 shares for $79,153.[4]  However, the Court finds PH Coors' sales irrelevant, as he is not named as a § 10(b) defendant.  Because Plaintiffs do not allege that PH Coors committed securities fraud himself, it is hard to see how his stock sales are evidence of a motive for Hunter and Joubert to commit securities fraud. And even if his sales were relevant, Plaintiffs fail to explain how PH Coors, as Chief Customer Relations Officer when those sales were made, had the opportunity to influence or to know about the calculation of deferred tax liabilities.

Hunter and Joubert's sales also fail to support Plaintiffs' motive allegations because Plaintiffs make no allegations as to why these sales are suspicious.  And any inference of scienter the Court might otherwise draw from defendants' stock sales is rebutted by evidence that the defendants retained or increased their holdings during the class period or where the sales were made pursuant to automatic trading plans created prior to the class period.  In re Level 3, 667 F.3d at 1346–47.  Here, SEC documents show that every individual defendant increased their stock holdings during the Class Period, and nearly all the stock sales were made pursuant to 10b5–1 trading plans, contemporaneous with the exercise of stock options the same day, or to

---

[4] In a footnote in their Complaint, Plaintiffs alleged that the individual defendants also disposed of over $11 million in stock that was withheld by Molson to cover the exercise price of the stock and to cover tax withholding obligations. However, Plaintiffs never make any argument as to why this fact is relevant or material to motive and therefore the Court does not consider it further.

cover tax withholdings.  Thus, these motive allegations fail to raise any inference of scienter.[5]

Beyond the stock sales, the only suggested motive is Plaintiffs' Opposition Brief argument that "Defendants hoped to obtain additional time to create a successful image."  (Opp'n Br. 23.)  The Court ignores this allegation because it was not raised in the FAC.  And even if the Court considered this new allegation, the Court would find that it is unsupported by any factual allegations and lacks merit. See Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d 662, 678 (D. Colo. 2007) ("[A]llegations of Red Robins' generalized motive to make the Company appear stable and successful provides no support for an inference of scienter.").

In sum, the Court finds that Plaintiffs have failed to allege a motive, and that the absence of a motive cuts strongly against an inference of scienter.

### e.    Lack of Confidential Witnesses and Internal Documents

Plaintiffs do not allege any corroborating witnesses or internal documents to support an inference of scienter.  Thus, there is no direct evidence that Defendants were aware of the accounting error during the Class Period.  Corroborating witnesses or documents are not necessary to plead scienter, but their absence further cuts

---

[5] At oral argument, Plaintiffs conceded that "there is not enough for the sales of stock to be motive here."  (MTD Hr'g Tr. 43.)  The Court reaches the same conclusion.

against an inference of scienter.  See, e.g., In re Crocs, Inc. Sec. Litig., 774 F. Supp.
2d 1122, 1150 (D. Colo. 2011); Andropolis, 505 F. Supp. 2d at 679–80.

> **f.    Importance of the Acquisition & Defendants' Familiarity
> with MillerCoors**

Plaintiffs argue that scienter can be inferred based on the importance of
MillerCoors' business to Molson, because MillerCoors cost Molson $12 billion and
accounts for approximately 80 percent of Molson's earnings.  Plaintiffs infer scienter
from this in several ways, which the Court finds of varying merit.

First, Plaintiffs argue that because the acquisition cost so much money and
involved such a substantial proportion of Molson's earnings, Defendants must have
known or been deliberately reckless in not knowing that they had failed to calculate
correctly the deferred tax liabilities involved.  Again, these facts cuts both ways.
Although the sheer amount of money involved suggests that Defendants would be
particularly attentive and take care to ensure that financial reporting was done
correctly, it also speaks to the complexity of the acquisition and how even an obscure
accounting error would be magnified in a complex and large transaction.  This might
suggest negligence or gross negligence, but it does not prove deliberate recklessness.

Next, Plaintiffs point to Defendants' public statements regarding the
acquisition, in which Defendants repeatedly highlighted the purported tax benefits of
the deal.  Plaintiffs argue that it is absurd to suggest that Defendants were unaware of
the tax-accounting error when the Defendants were focused on the tax benefits of the
deal and the transaction was significantly driven by tax considerations.  The Court

19

finds that these allegations provide some support for an inference of scienter, as they show that Defendants were particularly cognizant of tax issues material to the acquisition.

Next, Plaintiffs argue that MillerCoors' importance to Molson implicates the "core operations" doctrine theory to support scienter. That doctrine "refer[s] to instances where the nature of the [alleged fraud] was 'of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.'" In re Molycorp, Inc. Sec. Litig., 157 F. Supp. 3d 987, 1011 (D. Colo. 2016) (quoting South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 786 (9th Cir. 2008)). "In such instances, plaintiffs may sufficiently plead core-operations allegations without accompanying particularized allegations." Id. But the Tenth Circuit has "decline[d] to accept a 'core operations' inference in order to plead scienter, absent particularized facts showing what executives actually knew." Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc., 372 F. Supp. 3d 1139, 1154 (D. Colo. 2019) (citing Anderson, 827 F.3d at 1245).

Further, the core operations doctrine in any event does not apply here because the Court does not find that "it would be absurd to suggest" that Defendants were unaware of the accounting error. The tax-accounting error did not involve MillerCoors' core beer manufacturing and distribution operations but, rather, pertained to the deferred tax liability consequences of an acquired partnership interest. That technical tax issue does not constitute a core operation of Molson.

Finally, Plaintiffs argue that because Defendants were familiar with MillerCoors' operations and had access to its tax returns, Defendants had "direct knowledge" of the tax-accounting error. (Opp'n Br. 10.) Plaintiffs think the error "should have been especially obvious" to Joubert as former CFO of Miller Coors and Hunter as a former MillerCoors director. (Id.) However, Plaintiffs assert no particularized facts showing what Defendants actually knew. That certain Defendants also served leadership roles for MillerCoors does not give rise to any inference of scienter under these circumstances. Although one can reasonably expect those defendants to be familiar with MillerCoors' operations, that says nothing about whether they were aware of the tax-accounting principles at issue. These allegations do little to support an inference of scienter.

### g.     Defendants' Positions and Experience

Plaintiffs next assert scienter based on allegations that Defendants possessed high-level leadership positions in Molson, had access to the underlying financial data, and were experienced in finance. Some of these allegations support a weak inference of scienter.

Plaintiffs argue that Defendants must have known about the tax-accounting error based on their "management and oversight duties," "long history" at Molson, and "close involvement" with MillerCoors. (Opp'n Br. 9.) They also point out that Joubert worked with accountants to prepare the partnership tax returns, that Molson's Audit Committee reviewed and approved those documents, and that all defendants were responsible for overseeing the audit function and ensuing adequate internal

controls.  Finally, they emphasize that Joubert had an extensive accounting

background and had previously been MillerCoors' CFO.

All of that might suggest that Defendants were negligent in not discovering the

accounting error, but it does not give rise to an inference of intent to defraud or

deliberate recklessness because it fails to speak to whether Defendants were actually

aware of that error.  At best, the allegations regarding Joubert assert that this is the

sort of thing a CFO should have known.  But in general, these arguments boil down

to that Defendants must have known about the error simply because of their jobs.

The Court considers Defendants' positions as relevant to the scienter analysis, but it

"cannot infer scienter based only on a defendant's position in a company or

involvement with a particular project."  Anderson, 827 F.3d at 1245.

Plaintiffs' allegations provide little reason to believe that Defendants actually

were informed of the tax-accounting error prior to the Restatement.  See Kinder-

Morgan, 340 F.3d at 1106 (explaining that a defendant's corporate position is

relevant but that direct knowledge is "an important link in the inferential chain").

"Generalized imputations of knowledge do not suffice, regardless of defendants'

positions within the company."  Fleming, 264 F.3d at 1263–64 (quoting In re

Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999)).  Thus, these allegations

do little to support an inference of scienter.

### h.    GAAP Violations & SOX Certifications

Plaintiffs allege that the Restatement proves Defendants violated GAAP and

internal control compliance standards.  Plaintiffs identify these violations as

22

"powerful indirect evidence of scienter." (Opp'n Br. 11.) The Court finds that these allegations address the falsity of Defendants' financial statements, but not Defendants' scienter.

The issue here is not whether Defendants violated GAAP, but whether Defendants knew of the violations. The Court can infer that Defendants knew they had to follow GAAP, but because the Court finds that the Restatement was the result of a technical tax-accounting error, it cannot infer that Defendants knew they were violating GAAP. No factual allegations suggest that Defendants knew their financial statements were false.

"[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." Fleming, 264 F.3d at 1261 (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)). Absent evidence that Defendants knew of the GAAP violations or intended the financial statements to be misleading, the violations themselves do little to show scienter.

The same analysis applies to Defendants' certifications that its SEC filings were accurate and in compliance with the Sarbanes-Oxley Act ("SOX"). Like the GAAP violations, the issue here is not whether the SOX certifications were false when made, but whether Defendants made them knowing that they were false. Absent particularized facts suggesting that Defendants knew of the certifications' falsity, the certifications' mere existence is "unpersuasive" to prove scienter and at most supports an inference of negligence. See In re Zagg, 797 F.3d at 1205.

i.        **Financial Reporting "Red Flags"**

Plaintiffs identify three "red flags" regarding Molson's financial reporting and internal controls to support scienter: (1) in the year prior to the Class Period, Molson had four CFOs (or Interim CFOs); (2) a former MillerCoors executive had previously engaged in corporate fraud; and (3) market analysts questioned Molson's financial reporting during the Class Period. The Court does not find these allegations indicative of scienter.

First, that Molson had four CFOs in the year preceding the Class Period does not suggest that Defendants either knew or deliberately ignored accounting issues. Plaintiffs do not allege any such knowledge and there is no indication of accounting issues until the Restatement. If anything, the CFO turnover might favor Defendants by explaining why the accounting problem was missed, without saying anything about Defendants' scienter—it suggests mistake without resort to fraud.

Second, the previous fraud at MillerCoors is even less relevant. In 2013, a MillerCoors account manager admitted to running a fraudulent scheme to steal millions in marketing funds from Molson. Plaintiffs suggest that this was "a major red flag to the flaws and weaknesses in the internal control and compliance processes." (FAC ¶ 62.) The Court finds the prior fraud irrelevant, as it occurred three years before the MillerCoors acquisition and had no factual connection to the tax-accounting issue underlying the Restatement. Plaintiffs' argument is based on the proposition that a previous instance of fraud in a $30 billion company is

24

indicative of scienter for an unrelated tax-accounting error years later. The Court gives this argument no weight.

Finally, the questions asked by market analysts during Molson's earnings calls were unrelated to the specific accounting error at issue. Plaintiffs highlight one analyst question from Molson's Q3 2016 Earnings Call and one from the Q1 2017 call, but there is no indication that either question referred to the specific tax-accounting error at issue here. Plaintiffs fail to explain how these questions were specific enough to flag that error.

Overall, each of these "red flags" is too remotely connected to the accounting error at issue to give rise to any inference of scienter.

### j.    Corporate Executive Departures

Finally, Plaintiffs argue that the retirement or resignation of certain Molson executives following the Restatement supports scienter. Executive departures can strengthen an inference of scienter if they are numerous, uncharacteristic or accompanied by suspicious circumstances. Rumbaugh v. USANA Health Scis., Inc., 2018 WL 5044240, at *9 (D. Utah Oct. 17, 2018). But of the identified departures, only one involves a defendant in this case, and Plaintiffs do not explain why that departure is suspicious. The Court gives these executive departures no weight.

To start, three of the departures Plaintiffs rely upon are irrelevant: Molson's Chief Legal Officer, announced two weeks prior to the Restatement; Molson's Chief Supply Chain Officer, announced eight months after the Restatement; and Molson's Principal Accounting Officer, announced nine months after the Restatement. None

of these executives are named as defendants and there are no allegations connecting them to the alleged fraud.  The Court gives these departures no weight.

The only departure even potentially relevant is Hunter's retirement five months after the Restatement.  Plaintiffs' assertion that this departure was "clearly uncharacteristic and suspicious" is conclusory and unsupported by factual allegations.  (Opp'n Br. 22.)  Plaintiffs fail to explain why this retirement was suspicious, pointing only to its temporal proximity to the Restatement.  Absent factual allegations connecting Hunter's retirement to the alleged fraud, his departure at best gives rise to only a weak inference of scienter.

### 2.     Holistic Analysis

The Court must now consider these allegations together and decide "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324.  The Court thus compares the competing explanations for Molson's alleged fraud, determining whether the inference of scienter is at least as strong as the competing inference of honest mistake or negligence.

Plaintiffs' inference of scienter relies primarily on the mere existence of a $400 million tax liability understatement in Molson's financial statements relating to a critical, costly acquisition.  Defendants were familiar with MillerCoors' operations, had access to the data underlying the financial statements, and repeatedly touted their focus on the tax benefits of the acquisition.  These individuals had high levels of financial and accounting expertise, and knew that they were responsible for ensuring

26

that Molson had adequate internal controls over financial reporting and that Molson followed GAAP in its financial statements. Yet they allowed a material weakness in those controls to exist and issued two years of false financial statements.

The Court concludes that, considering Plaintiffs' allegations together, they give rise to only a weak inference of scienter. Many of the allegations they make are either unrelated to the Restatement or speak only to the falsity of the financial statements, not Defendants' scienter. At bottom, their argument is that the existence of a $400 million accounting error in a critical corporate acquisition is too meaty not to be the result of fraud. Under those circumstances, the Court would only find a strong inference of scienter if the error was so obvious that it would be absurd to conclude that Defendants did not know about it. The Court instead finds that the tax-accounting error was technical and non-obvious.

At oral argument, Plaintiffs pointed to Adams v. Kinder-Morgan, 340 F.3d 1083 (10th Cir. 2003), as a path for this Court to follow in rejecting Defendants' motion to dismiss.[6] That case has some similarities to this one. Plaintiffs argue that the Kinder-Morgan Court found scienter based on (1) alleged GAAP violations, (2) high-level executive involvement, and (3) the magnitude of the alleged falsity. See id. at 1105–07. These line up with the factors that this Court finds mostly in

_____

[6] Kinder-Morgan was decided before Tellabs defined a "strong inference" of scienter as one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 551 U.S. at 324. Kinder-Morgan defined a "strong inference" as one "that would convince a reasonable person that the defendant knew a statement was false or misleading." 340 F.3d at 1105. The Court does not find this difference dispositive.

favor of Plaintiffs here: (1) alleged GAAP violations despite Defendants' statements about their focus on the tax advantages of the acquisition and their access to MillerCoors' records; (2) Hunter and Joubert's financial expertise; and (3) the magnitude of the Restatement.  But as explained below, although those factors support some inference of scienter, that inference is not strong.

The <u>Kinder-Morgan</u> Court's basis for finding scienter was factual allegations that the defendant CFO had direct knowledge of the falsity of the statements at issue based on his conversations with a corroborating witness.  <u>Id.</u> at 1105.  The Court concluded that those particularized facts were sufficient to establish a strong inference of scienter as to the CFO, and because the CFO had direct knowledge of the falsity, the Court inferred that the CEO would likely also have such knowledge.  <u>Id.</u> at 1105–06.  As for the magnitude of the alleged falsity, the Court inferred scienter because the alleged falsity involved a substantial portion of the defendant company's income and because the source of that income (accelerated recognition of contract income) was challenged by the defendant company's outside auditor.  <u>Id.</u> at 1106. The Court also noted that the plaintiffs had alleged a motive, though it did not "accord much weight" to those allegations because they were not corroborated by a "reliable source."  <u>Id.</u> at 1104–05.

This Court concludes that <u>Kinder-Morgan</u> does not provide a path for finding a strong inference of scienter here.  Plaintiffs' case lacks any corroborating evidence to support direct knowledge of the alleged falsity by Hunter, Joubert, or any other corporate representative.  Absent such particularized facts, the Court cannot infer

scienter based solely on high-level executive positions.  And in contrast to the challenge by the outside auditor in <u>Kinder-Morgan</u>, the outside auditor here gave Defendants clean audits throughout the Class Period.  Finally, Plaintiffs' motive allegations are entirely lacking, as Plaintiffs concede.  These differences are sufficient to distinguish this case from <u>Kinder-Morgan</u>.

The Court finds that Plaintiffs' allegations do not give rise to an inference of scienter as strong as the competing inference—that the Restatement was a result of a material weakness in Molson's internal financial controls that none of the Defendants were aware of until the Restatement.  Four main points undergird this conclusion: (1) the lack of any witnesses, internal documents, or other direct evidence corroborating scienter, (2) the lack of a motive, (3) that the alleged fraud involves a technical tax issue rather than Molson's core operations, and (4) that PwC's audits did not detect the error.  Although none of these points are dispositive, each weighs strongly against an inference of scienter.  Because the Court considers the obviousness of the error the most meaningful consideration here, it deems PwC's involvement the strongest indicator against scienter.  Plaintiffs bring no claim against PwC and do not allege that Defendants concealed the fraud from PwC or that PwC was aware of the error or participated in the alleged fraud.  Plaintiffs thus fail to explain how PwC could have approved the audits if the error was as obvious as Plaintiffs claim.

Ultimately, Plaintiffs allege that Molson's CEO and CFO engaged in securities fraud for two years involving a tax-accounting principle that was so obvious that they

must have known about it, yet it was somehow undetected by PwC's audits, all so Molson's Chief Customer Relations Officer could make $4.7 million off stock sales while Molson's CEO made $126,800.08 and the CFO made $79,153.[7]  Based on these allegations, the Court finds that a reasonable person would not conclude that Plaintiffs' inference of scienter is as strong and compelling as Defendants' inference of mistake or negligence.

Accordingly, the Court concludes that Plaintiffs have failed adequately to plead scienter, forestalling their claims under § 10(b) and Rule 10b–5.  The Court dismisses those claims as to all defendants.

## B.    Section 20(a)

"To state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person."  In re Gold Res. Corp., 776 F.3d at 1118 (quoting Fleming, 264 F.3d at 1270).  Because the Court dismisses Plaintiffs' claims relating to primary violations of the Exchange Act, Plaintiffs' controlling person liability claims necessarily fail as well.  See id.  The Court dismisses those claims as to all defendants.

---

[7] These are gross sale figures.  Plaintiffs allege a nine percent drop in share prices as a result of the Restatement.  So even accepting Plaintiffs' allegations, the alleged fraud would have at most profited PH Coors by approximately $423,000, Hunter by approximately $11,412, and Joubert by approximately $7,124.

**C.**     **Leave To Amend**

Plaintiffs request leave to amend their complaint should the Court dismiss it. Because Plaintiffs inadequately present this request, the Court denies it and dismisses Plaintiffs' First Amended Complaint with prejudice.

To start, "[i]t is normally improper to request leave to amend a complaint in response to a motion to dismiss," as opposed to in a separate motion. Nardy v. Chipotle Mexican Grill, Inc., 2019 WL 3297467, at *18 (D. Colo. Mar. 29, 2019). This District's Local Rule 7.1(d) provides that a "motion shall not be included in a response or reply to the original motion. A motion shall be filed as a separate document." Plaintiffs' request for leave to amend is not filed as a separate motion, but as part of their brief in opposition to Defendants' motion to dismiss.

Beyond that, Plaintiffs' request is inadequately presented because it is only a single sentence at the end of Plaintiffs' brief. This also is sufficient grounds for denying leave to amend. In re Gold Res. Corp., 776 F.3d at 1118 ("[A] request for leave to amend must give adequate notice to the district court and to the opposing party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it." (quoting Calderon v. Kan. Dep't of Soc. & Rehab. Servs., 181 F.3d 1180, 1187 (10th Cir. 1999))). A "single sentence, lacking a statement for the grounds for amendment and dangling at the end of [the] memorandum, [does] not rise to the level of a motion for leave to amend." Id. Plaintiffs tried to cure this fault at oral argument by providing a basis for the

proposed amendment, but these arguments either involved issues that this Court finds irrelevant or were made at a level of generality unhelpful to this Court.

Absent any stated basis for the proposed amendment, "a district court need not independently determine whether grounds justifying an amendment exist." Sanchez v. Crocs, Inc., 667 F. App'x 710, 725 (10th Cir. 2016) (unpublished). Plaintiffs have already filed a detailed, 125-page complaint, and waited until oral argument to try to explain how they would amend it to remedy its deficiencies. Where a party fails "to proffer what additional evidence they would plead or how such additional evidence would remedy the [complaint's] deficiencies," leave to amend need not be granted. McNamara v. Pre-Paid Legal Servs., Inc., 189 F. App'x 702, 718 (10th Cir. 2006) (unpublished).

Accordingly, the Court denies Plaintiffs' request for leave to amend and dismisses Plaintiffs' First Amended Complaint with prejudice.[8]

### III.   CONCLUSION

For the foregoing reasons, the Court dismisses Plaintiffs' First Amended Complaint in its entirety, and with prejudice. The Clerk is directed to enter judgment for Defendants.

---

[8] Plaintiffs' Opposition Brief also included a request for this Court to lift the discovery stay under PSLRA and a request for leave to add an additional plaintiff. Plaintiffs withdrew both requests at oral argument.

DONE AND SIGNED this  2nd   day of   December  , 2020.

BY THE COURT:

*s/ David M. Ebel*

U. S. Circuit Court Judge